2002-NMCA-097

54 P.3d 542

**In the Matter of the ESTATE OF Harry L. DEUPREE,**

**Chery Fenley, Personal Representative of Lucille Fenley, Deceased, Petitioner–Appellant,**

v.

**The Estate of Harry L. Deupree, Deceased, Respondent–Appellee.**

**No. 22,364.**

Court of Appeals of New Mexico.

June 26, 2002.

Certiorari Granted, No. 27,636, Sept. 9, 2002.

Robert J. Dodds III, Davenport & Dodds, LLP, Santa Fe, NM, for Appellant.

Mark L. Ish, Carol J. Ritchie, Felker, Ish, Ritchie & Geer, P.A., Santa Fe, NM, for Appellee.

## OPINION

PICKARD, Judge.

{1} Through a trust instrument distributing his assets, Harry Deupree granted his wife, Lucille, a life estate in their home on Cloudstone Drive in Santa Fe (the Cloudstone Property). The instrument also provided that if Lucille decided she no longer wanted to live at the Cloudstone Property, or was unable to live there, the house was to be sold, and the proceeds used for her "health and maintenance." Under a separate Settlement Agreement with Harry's children, Lucille was also to receive $63,600 from the proceeds of the sale of the house.

{2} Lucille died one year after Harry. In the months before her death, Lucille lived at the Cloudstone Property, but received around-the-clock nursing care. The question before us is whether the provisions of the trust instrument allowed the trustee to pay for Lucille's nursing expenses while she was still living at the Cloudstone Property. The district court concluded that it did not, and held that Lucille's interest in the proceeds of the sale established in the Settlement Agreement must be offset against the amount expended for her nursing care. We agree, and we therefore affirm the decision of the district court.

## FACTS

{3} Harry's estate plan was expressed in a Revocable Trust Agreement and a subsequent amendment. The provisions of these

instruments ensured that Lucille, his second wife, would always have a place to live after his death. The instrument granted Lucille a life estate in the Cloudstone Property. The trust agreement also provided that

> If LUCILLE DEUPREE no longer desires or is able to live in the Principal Residence, the Trustee shall sell the Principal Residence at a sales price and upon such terms and conditions as the Trustee in his sole and absolute discretion deems appropriate. The net proceeds derived from the sale of the Principal Residence shall be held in trust for LUCILLE DEUPREE for her life. The Trustee shall pay to LUCILLE DEUPREE during her life all of the net trust income and such portions or all of the principal of the trust for LUCILLE DEUPREE'S ... health and maintenance in reasonable comfort. The Trustee is also hereby authorized to use the principal of the trust to purchase ... a new residence for LUCILLE DEUPREE, which new residence shall be owned by the trust.

After Lucille's death, the remainder of the proceeds from the sale was to be distributed to Harry's five adult children ("the Deupree children"), except for $35,000 to be distributed to Lucille's two children. During her lifetime, however, the trust assets were to be used for Lucille's benefit without consideration of the future beneficiaries.

{4} The trust instrument also provided for the distribution of Harry's personal property. He left Lucille six paintings worth approximately $60,000. He also left her royalties from oil and gas interests. The rest of the personal property was devised to Harry's children. Harry named two of his children, Harry Jr. and William, to succeed him as trustee.

{5} Harry died in February 2000. Just a few weeks later, a conflict arose between Lucille and the Deupree children. Even though they had not yet been appointed as personal representatives, and even though they had not yet initiated probate proceedings, the Deupree children arrived at the Cloudstone Property with a moving van and began removing items of personal property. Lucille obtained a restraining order prohibiting the Deupree children from removing any additional items or selling the items removed until the administration of the estate was complete. Because of this conflict, Lucille moved to have the Deupree children removed as trustees. The parties were able to negotiate a Settlement Agreement, reached in October 2000. The Settlement Agreement created a separate "Residence Trust," which was to be administered by the First National Bank of Santa Fe ("the Bank"). The Deupree children remained trustees for the remaining trust assets. Lucille gave up her claim to the artwork, as well as her right to the family and personal property allowances, *see* NMSA 1978, §§ 45-2-402 to -403 (1993, as amended through 1999), in exchange for a lump sum of $60,000 to be paid out of the proceeds of the sale of the Cloudstone Property. She gave up her right to future oil and gas royalties for a lump sum of $3,600, also to be paid out of the proceeds from the sale of the house. The Bank began managing the Residence Trust on November 1, 2000.

{6} By that time, Lucille was very ill. She was partially paralyzed and non-responsive to those around her for long periods of time. She was in so much pain that she was unable to sit comfortably in a wheelchair. She remained in her bed 24 hours a day. Her daughter, Chery Fenley, testified that it had been clear by July 2000 that Lucille could not live on her own. At that time, Chery began investigating the possibility of moving her mother to a nursing home, and in the meantime Chery hired nursing staff to care for her mother at the Cloudstone Property.

{7} Shortly after assuming its duties as trustee, the Bank put the Cloudstone Property up for sale. Chery visited a local nursing home to inquire about moving her mother there. Lucille's personal physician, however, advised against moving her, and Chery also decided that she did not want to move her mother into the nursing home. Lucille remained at the Cloudstone Property and continued to receive nursing care around the clock. To pay for these expenses, the Bank took out a mortgage against the house, anticipating that the funds would be repaid out of the proceeds of the sale. Lucille died in

February 2001. The house was sold in March.

{8} After the sale of the house, Lucille's children filed a motion to compel the payments due to Lucille's estate under the Settlement Agreement. In response, the Deupree children argued that the Bank wrongly mortgaged the house to pay for Lucille's health care expenses. They argued that Lucille was not entitled to access the Residence Trust until she had moved out of the Cloudstone Property. Because she remained living at the property until she died, they argued, any personal expenses should have come out of her own money. Therefore, the Deupree children argued that they were entitled to offset the amount spent for her nursing care against her entitlement under the Settlement Agreement. Because more than $63,600 was spent on Lucille's nursing expenses, the children argued that no money was owed to Lucille's estate.

{9} The district court held a hearing on the proper distribution of the trust assets. The attorney who drafted the trust agreement testified that it was Harry's intent that Lucille pay for her own personal expenses until she moved out of the Cloudstone Property. The district court agreed with that interpretation and held that the Deupree children were entitled to set off Lucille's nursing expenses against her entitlement under the Settlement Agreement. The district court therefore denied Chery's motion to compel payment of the settlement amount. Chery appeals to this Court.

**DISCUSSION**

 {10} The question on appeal is what event triggered Lucille's right to access the Residence Trust. In construing the provisions of wills and trust instruments, "the court must attempt to ascertain and give effect to the testator's intent." *In re Estate of Russell*, 119 N.M. 43, 45, 888 P.2d 489, 491 (Ct.App.1994). In ascertaining the settlor's intent, the reviewing court must determine whether or not the language of the trust instrument was ambiguous. *See In re Estate of Armijo*, 2001-NMSC-027, ¶¶ 15–18, 130 N.M. 714, 31 P.3d 372. The question of whether a provision is ambiguous is a question of law reviewed de novo. *Id.* ¶ 7. The critical test in determining whether an instrument is ambiguous is whether the testamentary intention can be gleaned from the face of the instrument. *Id.* ¶ 16. If so, there is no ambiguity. *Id.* If the court determines that the language is reasonably and fairly susceptible to different constructions, an ambiguity exists. *Mark V, Inc. v. Mellekas*, 114 N.M. 778, 781, 845 P.2d 1232, 1235 (1993) (establishing rules of contract interpretation). At that point, if the proffered evidence of surrounding facts and circumstances is in dispute, turns on witness credibility, or is susceptible of conflicting inferences, the meaning must be resolved by the appropriate fact finder. *Id.* at 782, 845 P.2d at 1236.

 {11} The district court held that the language of the trust instrument did not allow Lucille to access the trust while she was living in the Cloudstone Property. Chery offers a different interpretation. Relying on language instructing the trustee to sell the house once Lucille "*no longer desires or is able to* live in the Principal Residence," Chery argues that Lucille was entitled to access the Residence Trust as soon as she made the decision to move out of the Cloudstone Property, and that her actual physical location was irrelevant. Chery bolsters her argument by comparing that language with a separate clause in the trust instrument providing that, "During any time in which LUCILLE DEUPREE resides in the Principal Residence, she shall pay all property taxes, assessments, and utility bills on the Principal Residence, as well as all maintenance and repair costs on the Principal Residence." This provision, she notes, clearly tied Lucille's obligation to pay for residential expenses to her physical presence in the house. If it was Harry's intent that Lucille could not access trust income for her personal health and maintenance expenses until after she moved out of the Cloudstone Property, Chery argues, he could have drafted a similar provision describing Lucille's obligation in similarly clear language. The different language used in the provision regarding Lucille's ability to access the trust, Chery argues, reflects an intent to establish more flexibility in providing for Lucille's personal health and maintenance expenses than the

specific costs associated with maintaining the residence.

{12} While the provision regarding residential expenses is expressed more clearly, we cannot agree that the difference in language between the two provisions conclusively establishes Harry's intent to allow Lucille to access the trust while still living at the Cloudstone Property. However, we do think that the language is ambiguous, in that it is reasonably susceptible to the two different interpretations offered by the opposing parties. Therefore, we think it was proper for the district court to rely on extrinsic evidence in order to ascertain Harry's intent. *See id.* at 782, 845 P.2d at 1236 ("In order to determine the meaning of the ambiguous terms, the fact finder may consider extrinsic evidence of the language and conduct of the parties and the circumstances surrounding the agreement, as well as oral evidence of the parties' intent."); *In re Estate of Armijo,* 2000–NMCA–008, ¶ 13, 128 N.M. 565, 995 P.2d 487 (stating that extrinsic evidence is properly admissible when will is ambiguous), *rev'd on other grounds,* 2001–NMSC–027, 130 N.M. 714, 31 P.3d 372. In addition, no one objected below to the taking of evidence on the question of Harry's intent. *See Woolwine v. Furr's, Inc.,* 106 N.M. 492, 496, 745 P.2d 717, 721 (Ct.App.1987).

{13} The testimony presented at the hearing supports the interpretation advanced by the Deupree children, not Chery. Of the evidence presented, we find most significant the testimony of the attorney who drafted the trust instrument for Harry. The attorney testified that in the years before he died, Harry would sell pieces from his art collection in order to support himself. Harry left several paintings to Lucille, the attorney testified, so that she could sell them as needed to support herself. Harry left Lucille oil and gas royalties for the same purpose. In contrast, Harry drafted Paragraph 3.2, the provision in question, in order to provide Lucille with a place to live. Harry initially granted Lucille the right to live at the house for only two years after his death, with the same option of selling the house to create a support trust. When Lucille objected, he amended the trust instrument to include the life estate, leaving the conversion option in place. The attorney testified that Harry did not intend to allow Lucille to access the trust while she was still living at the Cloudstone Property. According to the attorney, Harry believed that Lucille would not need to access the trust while living at the Cloudstone Property because the paintings and royalties would provide sufficient resources to support her.

{14} This testimony was uncontradicted. Chery presented testimony from Bank officials, who indicated that they believed Lucille had the right to access the trust during her final months at the Cloudstone Property. Chery testified as to events that occurred before her mother's death. One of Lucille's health care providers testified as to Lucille's physical condition in the months before her death. None of these witnesses had firsthand knowledge of Harry's intent in drafting the specific trust provisions in question. The Bank officials who testified were relying on their own interpretation of the instruments itself, not on any interaction with Harry during his lifetime. Based on the attorney's uncontradicted testimony, we cannot say that the district court erred in concluding that the Deupree children's interpretation of the trust instrument was consistent with Harry's intent. Although the district court did not rely expressly on the attorney's testimony, the testimony provided substantial evidence to support the court's conclusion.

{15} We also think that this interpretation fits more closely with the language of the instrument. The trust instrument sets up a sequence of events that was to occur in the event that Lucille either decided that she no longer wanted to live in the Cloudstone Property, or found that she was unable to live there. First, the trustee was to put the house up for sale. Once the house was sold, the proceeds from the sale of the house would be put into a trust. The trust would then be used for Lucille's "health and maintenance." If the trustee had followed this sequence of events, then no trust funds would have been available to Lucille until the trustee had received the proceeds of the sale. Until then, no trust would exist. Indeed, the Deupree children argue that the trustee had

no authority to mortgage the Cloudstone property, and therefore had to wait until after the house was sold and the trust was established before distributing proceeds to Lucille.

{16} We need not determine the scope of the trustee's authority, however, to decide the case before us. If Lucille had the right to access the trust funds, then the Deupree children are not entitled to offset her nursing expenses against her interest in the proceeds from the sale, and it is irrelevant whether the trustee obtained those funds through a mortgage or through a sale. If she did not have the right to access the trust, then the Deupree children are entitled to an offset. The question of the trustee's authority might have been relevant in an action to surcharge the trustee for wrongfully distributing trust funds, but the Deupree children chose not to bring such an action.

{17} Another interpretation is that the trustee would have been required to pay Lucille's living expenses as soon as she moved out of the house, even if the house had not yet sold. We need not decide whether this is the correct interpretation of the instrument because Lucille never moved out of the house and the house was not sold before her death. Regardless of which of these events was the trigger, it did not occur. We hold that the district court's decision was correct because we cannot agree with Chery's argument that Lucille's subjective state of mind triggered her right to access the trust funds. As it turned out, Chery, who had Lucille's power of attorney, decided to move her mother into a nursing home, then changed her mind. Based on Chery's interpretation, Lucille would have had the right to access funds from the Residence Trust after Chery decided to move her to a nursing home, but that right would have terminated when Chery changed her mind.

{18} As an alternative argument, Chery contends that Lucille was no longer able to live in the Cloudstone Property once she became unable to live there on her own. This argument is without merit. Lucille was, in fact, living in the house up until the day she died.

■ {19} Harry most likely did not anticipate the series of events that came to pass after his death. The provision he drafted seems to assume that, as his wife's health deteriorated, she would be able to move out of the house and into a nursing home. He did not seem to anticipate that, due to a combination of factors, she would require around-the-clock nursing care while still living at home. He also most likely did not anticipate that Lucille would enter into a Settlement Agreement that undermined his plan to provide her with liquid assets. It is possible that, if Harry anticipated these events, he would have drafted the instrument differently. However, a court cannot rely on its own judgment to defeat a testator's intent, even though the court may believe that the settlor would change the terms of the distribution if he was aware of the changed circumstances. *See In re Estate of Padilla,* 97 N.M. 508, 513, 641 P.2d 539, 544 (Ct.App. 1982). From the language of the instrument and the supporting testimony of Harry's attorney, it seems clear that Harry intended that Lucille have access to the Residence Trust only after she had moved out of the Cloudstone Property. We cannot vary from that intent, even if we believe Harry would have wanted to provide for his wife's nursing care in her final days.

{20} Chery argues that the district court's ruling imposes a requirement that Lucille expend all her own resources before accessing the trust, even though there was no such requirement in the trust instrument. They cite cases from other states for the proposition that the beneficiaries of a support trust need not exhaust their own resources before receiving trust benefits. *See, e.g., Godfrey v. Chandley,* 248 Kan. 975, 811 P.2d 1248, 1251 (1991); *In re Estate of Lindgren,* 268 Mont. 96, 885 P.2d 1280, 1283 (1994). Chery misconstrues the district court's holding. As long as Lucille lived in the Cloudstone Property, she was required to use her own resources to support herself. Once she moved out, she could rely on the trust. There was no requirement that she exhaust her own resources before moving out of the house. Had Lucille moved out of the house before her death, she could have relied on trust resources even though she still had her own

personal resources available. None of these cases Chery cites are applicable, because in those cases the beneficiaries' rights to access the trust were not contingent upon the happening of any particular event.

## CONCLUSION

{21} As long as Lucille Deupree was living at the Cloudstone Property, she had to rely on her own personal resources to pay for her nursing care. In the months before her death, Lucille had no resources except for social security income and her $63,600 interest in the future proceeds of the sale of the house. Lucille had to use those resources to pay for her nursing care. The district court properly offset the nursing expenses against Lucille's interest in the proceeds, and thus properly denied Chery's motion to compel payments under the Settlement Agreement. We therefore affirm the decision of the district court.

{22} **IT IS SO ORDERED.**

WE CONCUR: RICHARD C. BOSSON, Chief Judge, and RODERICK T. KENNEDY, Judge (specially concurring).

KENNEDY, Judge (specially concurring).

{23} The legal posture of this case determined the result. Allowing the setoff for the advancement of expenses for her care is legally correct, and supremely unsatisfying. But for the fact that Lucille died while the bank was paying these expenses, this tragedy would have been far deeper. When it comes to acknowledging that there is no remedy for every wrong, I confess to my frustration and a lack of restraint in filing this concurrence. I do concur in the opinion. I cannot let the facts pass unmentioned.

{24} Two weeks after Harry's death, and prior to their appointment as personal representatives under Harry's will, Harry's two eldest sons, William and Harry Jr., who were the named trustees of the estate, pulled a moving van up to Lucille's home and cleaned it out of assets left to her by Harry. These assets were clearly intended to support her in what turned out to be her infirmity. This was a blatant violation of the trust, their fiduciary duties, and their moral obligations. Lucille then succeeded in obtaining a restraining order, but ultimately negotiated a settlement on unfavorable terms in which she agreed upon cash values for artwork and other assets rightfully hers. Doubtless, her illness played a great part in this process.

{25} Because the best equitable argument was left unargued on appeal, these actions by the greedy Deupree children cannot be used for their true value in this case. Persons who had so little regard for their fiduciary duties might properly be castigated at equity *for ignoring them. But for the initial wrong of cleaning out the house when Lucille occupied it in her infirmity, Harry's plans to take care of his wife would have been unhampered.*

{26} Every bone in my judicial body wants to find a way to undo that setoff. Under the law, however, it is the correct result. I fully concur in the legal analysis and result in this case.