IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2010-NMSC-017

Filing Date: March 23, 2010

Docket No. 30,787

IN THE MATTER OF THE CABLE
FAMILY TRUST DATED JUNE 10, 1987,
AS AMENDED

GARY D. CABLE,

      Beneficiary-Petitioner,

v.

WELLS FARGO BANK NEW MEXICO, N.A.,

      Petitioner-Respondent.

ORIGINAL PROCEEDING ON CERTIORARI
Clay Campbell, District Judge

Law Offices of Jane B. Yohalem
Jane B. Yohalem
Santa Fe, NM

for Petitioner

Hurley, Toevs, Styles, Hamblin & Panter, P.A.
Gregory W. MacKenzie
Albuquerque, NM

for Respondent

## OPINION

**DANIELS, Justice.**

**{1}** This case requires us to determine whether the community property trust created by a married couple granted the surviving spouse the power to amend the trust's remainder distribution schedule after the death of the first spouse. The Court of Appeals upheld the

1

affirmative answer to that question by the district court solely on the theory that the surviving spouse's undisputed right to withdraw all assets of the trust estate implicitly included a lesser power to amend the trust. While we conclude that the Court of Appeals was correct in upholding the surviving spouse's right to amend, we do so through a broader analysis of the totality of the trust provisions. Because we hold that the power of amendment was specifically intended by the grantors in this case, we do not need to hypothesize whether an unrestricted power to withdraw necessarily includes a power to amend in all cases as a matter of law.

## I.      BACKGROUND

**{2}**      In July 1987, Lowell and Martha Cable created the Cable Family Trust to care for the needs of each other and to distribute any assets that remained after the deaths of both of them to their three children, Petitioner Gary Cable, Larrie Cable, and Shirley Trevino (for purposes of clarity, all family members will be referred to by their first names in this Opinion). Although the property initially placed into the trust was separate property, in December of the same year, Lowell and Martha entered into a community property agreement that designated "all property, . . . regardless of when acquired, and all property hereinafter acquired" as community property. Three months later, Martha died, leaving Lowell as the sole surviving grantor.

**{3}**      Over the next fifteen years, Lowell made a series of amendments to the trust, among which were his 1988 appointment of Gary as trustee and his 1994 amendment, after he remarried, replacing Gary as trustee with a predecessor of Wells Fargo Bank. Of particular significance to the issues in this case is Lowell's 1999 amendment to the post-trust distribution schedule, redirecting 39 percent of the trust remainder to (1) his eleven grandchildren (2.5% each); (2) five nonprofit organizations—The Salvation Army, Habitat for Humanity, Albuquerque Rescue Mission, Albuquerque Little Theatre, and Musical Theatre of the Southwest (1.5% each); (3) St. Paul Lutheran Church (2.5%); and (4) two close friends (1.5% jointly). The greater part of the trust remainder, 61 percent of the total, was still to be distributed among Martha and Lowell's three children, but the original equal three-way distribution among them was amended to provide for a 30-30-40 split, with 18.3 percent of the total trust proceeds going to each of their two sons, Gary and Larrie, and 24.4 percent going to their daughter, Shirley. In dollar terms, the amended distribution schedule meant that Shirley would receive roughly $36,600 more than either of her brothers. The 1999 amendments were the last made before Lowell died in 2002.

**{4}**      After Lowell's death, trustee Wells Fargo filed a petition in the district court for approval to distribute the remainder of the trust estate, amounting to about $600,000, in accordance with the 1999 amended distribution schedule. Gary filed a written opposition to Wells Fargo's request and moved for declaratory judgment and summary judgment. His position was that all of the trust amendments Lowell had made in the years after the death of Martha, including the 1999 distribution schedule, were beyond Lowell's authority as surviving grantor. Gary argued that he therefore was entitled to receive a full one-third share

of the trust remainder, as originally designated in the 1987 schedule, instead of the 18.3 percent he would receive by the terms of the 1999 schedule, a dollar difference of about $90,000.

{5}     Much of the focus of the litigation in this case has been the proper interpretation of Section 9.1 of the instrument creating the trust, which provides in its entirety:

> 9.1  Power in Grantors During Lifetimes of Grantors.  Grantors reserve the right at any time or times to amend or revoke this instrument and the trusts hereunder, in whole or in part, by an instrument or instruments in writing, signed by Grantors and delivered in Grantors' lifetimes to Trustee; provided, however, that no such alteration, amendment or revocation shall affect the character of any property held by the Trust, and the interest of the Husband and Wife in the various Trust assets, whether community, separate or otherwise, shall retain its character as such.  Nothing herein shall be construed as a transfer of separate properties from Husband to Wife, or from Wife to Husband, and in the event of any revocation, all property shall be reconveyed to the respective owners.  If this instrument is revoked in its entirety, the revocation shall take effect upon the delivery of the required writing to Trustee.  On the revocation of this instrument in its entirety, Trustee shall deliver to Grantors, or as Grantors may direct in the instrument of revocation, all the Trust property.  Notwithstanding the foregoing, the Grantors may specifically declare in writing certain assets to be community property.

{6}     Wells Fargo filed a motion for summary judgment that relied primarily on provisions contained in the trust instrument itself, but that also relied on a supporting affidavit executed by Wayne Marsh, the attorney who had drafted the original 1987 Cable Family Trust agreement at Lowell and Martha's request.  Mr. Marsh's affidavit recited in relevant part (1) that he drafted Section 9.1 of the agreement to provide that Grantors "reserve the right at any time or times to amend or revoke" the trust and its provisions; (2) that it was his practice to explain to his clients that this standard language routinely used by him in trust agreements "confers upon the surviving spouse the power to amend the trust agreement after the death of the first spouse"; and (3) that, as the attorney who prepared the agreement for Lowell and Martha, he believed that Section 9.1 accurately stated the intent of his clients to allow the surviving spouse the power to amend.  Gary argued in opposition that the use of the plural term "Grantors" in Section 9.1 meant that both grantors had to agree jointly to any amendment, and that it was therefore impossible for Lowell to have any such amendment power after Martha's death.

{7}     The district court granted summary judgment in favor of Wells Fargo, agreeing that Lowell, as surviving grantor, had the power of amendment, and the Court of Appeals affirmed that result.  *Cable v. Wells Fargo Bank N.M., N.A. (In Re Cable Family Trust)*, 2008-NMCA-005, 143 N.M. 269, 175 P.3d 937 (filed 2007).  The Court of Appeals rejected

3

attorney Marsh's interpretation of the effect of Section 9.1 of the trust and instead relied exclusively on Section 2.4, which provided in relevant part: "Trustee shall . . . pay over to the surviving Grantor such amount or amounts of principal as the surviving Grantor may demand in writing delivered to Trustee." *Id.* ¶ 2. In essence, the Court viewed the power to take all as necessarily including the power to take less than all and to redistribute it. *Id.* ¶¶ 1, 17.

**{8}**     We granted certiorari to consider those issues.

## II.     STANDARD OF REVIEW

**{9}**     The parties agree that the material facts in this case are undisputed and that the case should have been resolved by summary judgment, although they disagree about the principles of law that should be applied to the undisputed facts. "An appeal from the grant of a motion for summary judgment presents a question of law and is reviewed de novo. Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Montgomery v. Lomos Altos, Inc.*, 2007-NMSC-002, ¶ 16, 141 N.M. 21, 150 P.3d 971 (internal quotation marks and citations omitted).

**{10}**     The legal inquiry in this case involves the interpretation of trust language and the application of statutes to the trust and its terms. Both tasks also require de novo review. *Arch, Ltd. v. Yu*, 108 N.M. 67, 71, 766 P.2d 911, 915 (1988) ("When the issue to be determined rests upon the interpretation of documentary evidence, this Court is in as good a position as the trial court to determine the facts and draw its own conclusions."); *State v. Nick R.*, 2009-NMSC-050, ¶ 11, 147 N.M. 182, 218 P.3d 868 ("Statutory construction is a matter of law we review de novo.").

## III.     DISCUSSION

*Role of Grantor's Intent*

**{11}**     We start with the basic principle that "[i]n construing the provisions of wills and trust instruments, the court must attempt to ascertain and give effect to the [grantor's] intent." *Fenley v. Estate of Deupree (In re Estate of Deupree)*, 2002-NMCA-097, ¶¶ 10, 12, 132 N.M. 701, 54 P.3d 542 (noting that a court may consider the language and conduct of the parties, the surrounding circumstances, and, where needed to interpret ambiguous language, extrinsic evidence of the parties' intent, including testimony of the attorney who drafted the trust) (internal quotation marks and citation omitted); *Loco Credit Union v. Reed*, 85 N.M. 729, 733, 516 P.2d 1112, 1116 (1973) (emphasizing the need to honor the intent of the grantors, despite deficiencies in technical document drafting).

**{12}**     In the Uniform Trust Code (UTC), adopted by the New Mexico Legislature in 2003 as NMSA 1978, Sections 46A-1-101 to 46A-11-1105 (2003, as amended through 2009), the

4

phrase "terms of the trust" is defined as "the manifestation of the settlor's intent regarding a trust's provisions as expressed in the trust instrument or as may be established by other evidence that would be admissible in a judicial proceeding." Section 46A-1-103(R); *see also* Restatement (Third) of Trusts: Terms of the Trust § 4 (2003) ("The phrase 'terms of the trust' means the manifestation of intention of the settlor with respect to the trust provisions expressed in a manner that admits of its proof in judicial proceedings.").

> The phrase "the terms of the trust" is used in a broad sense . . . [and] includes any manifestations of the settlor's intention at the time of the creation of the trust, whether expressed by written or spoken words or by conduct . . . . The terms of the trust may appear clearly from written or spoken words, or they may be provided by statute, supplied by rules of construction, or determined by interpretation of the words or conduct of the settlor in the light of all of the circumstances surrounding the creation of the trust.

Restatement (Third) of Trusts: Terms of the Trust § 4 cmt. a.

**{13}** As with other types of donative documents, the primary evidence of grantor intent is the plain language of each provision, when read in conjunction with the document as a whole:

> The text of a donative document must be read in its entirety. Each portion, whether it be a word, phrase, clause, sentence, paragraph, article, or some other portion, is connected to a whole. The donor is presumed to intend that the various portions complement or modify each other. The case may arise, for instance, in which two portions, read in isolation, appear contradictory. But, when construction of the document as a consistent whole would be facilitated by reading one portion as modifying the other or reading both as mutually modifying each other, that construction prevails.

Restatement (Third) of Prop.: Wills & Other Donative Transfers § 10.2 cmt. b (2003). *See generally* § 46A-1-112 (stating that the rules of construction for documents disposing of property "apply as appropriate to the interpretation of the terms of a trust and the disposition of the trust property").

*Analysis of Trust Expressions of Grantor Intent*

**{14}** Instead of trying to draw conclusions about the intent of Lowell and Martha from parsing language in isolated parts of their trust documents, we must instead examine all relevant components and then consider how they fit together to compose the whole expression of their intent. Viewed in that manner, we conclude that the documentation reflects an overarching intent to create a trust that would (1) provide for both Lowell and Martha, with the power to amend or revoke its provisions during their joint lifetimes; (2) provide for the needs and wishes of the surviving spouse, with the same power to amend or

5

revoke after the death of the first of them; and (3) convey any remaining assets in the trust estate to other beneficiaries after the deaths of both spouses. A number of sections of the trust documentation support this interpretation and reflect a clear intention to vest complete control of the entire estate in the surviving spouse after the death of the first.

{15}     To begin with, the section specifically governing trust interpretation provides a clear expression of Lowell and Martha's intent that all provisions of the trust are meant to be liberally construed in favor of the surviving spouse's interests and above the interests of other beneficiaries:

> 1.6    Interpretation. Inasmuch as the continued welfare of Grantors is of primary and paramount concern, Trustee is directed to liberally construe all provisions of this trust in favor of the surviving Grantor, and if there is any doubt or conflict of interest, the rights and interests of the surviving Grantor shall be dealt with by Trustee as primary and paramount to the rights and interests of all other beneficiaries.

{16}     The first sentence of Section 2.1, entitled "Both Grantors Living and Competent," makes it clear that "[w]hile both Grantors are living, Trustee shall dispose of the net income and principal of the community property of this trust as *both* Grantors may direct Trustee from time to time by a written instrument signed by *both* Grantors and delivered to Trustee." (Emphasis added.) By contrast, Section 2.3, entitled "Death of First Grantor to Die," provides that "[u]pon the death of the first Grantor to die (hereinafter referred to as 'deceased Grantor'), the remaining trust estate shall be administered and distributed in accordance with the *subsequent* provisions of PART TWO." (Emphasis added.)

{17}     The "subsequent provisions of PART TWO" include Section 2.4, entitled "During Surviving Grantor's Lifetime," which explicitly directs not only that the Trustee shall pay "for the surviving Grantor's benefit such amounts of principal as Trustee may deem necessary or advisable for his or her care, maintenance and support in reasonable comfort," but also that the survivor is given an unrestricted right to take any or all of the trust assets on demand: "Trustee shall also pay over to the surviving Grantor such amount or amounts of principal as the surviving Grantor may demand in writing delivered to Trustee."

{18}     Another of the "subsequent provisions of PART TWO" recognizes the right of the survivor to redirect the distribution of all of the trust remainder "for the use and benefit of such person or persons, including the estate of the surviving Grantor, upon such conditions, with such powers, in such manner, and at such times as the surviving Grantor shall direct by his or her Last Will and Testament."

{19}     Wells Fargo also argues that, in addition to the surviving grantor's unrestricted power to take all the trust assets during the surviving grantor's lifetime under Section 2.4 and the unrestricted power to redistribute the remainder through a will provision, Section 9.1, "Power in Grantors During Lifetimes of Grantors," also recognizes the right of the survivor

6

to continue to exercise the right of amendment or revocation through any signed document: "Grantors reserve the right at any time or times to amend or revoke this instrument and the trusts hereunder, in whole or in part, by an instrument or instruments in writing, signed by Grantors and delivered in Grantors' lifetimes to Trustee . . . ."

{20}    Gary argues, and the Court of Appeals agreed, that the use of the plural term "Grantors" in Section 9.1 excludes the power of one grantor, even after the death of the first, to continue to exercise the power of revocation or amendment.  We disagree for several reasons.

{21}    To begin with, such a narrow construction would be inconsistent with the thrust of the several provisions of Sections One and Two that emphasize the unrestricted power of the survivor to use and control the trust assets, both before and after his or her death.

{22}    Second, there are a number of other provisions in the document that assist in the proper interpretation of Section 9.1.  One of those is Section 4.2, "<u>Gender and Number</u>," which provides that "[t]he neuter gender shall include the masculine and feminine, and the masculine gender shall include the neuter and feminine and words used in the singular shall include the plural and vice versa."  On that same subject, the trust also contained a final section entitled "FURTHER TERMS AND PROVISIONS," which "supersede any of the preceding provisions which may be in conflict" and which emphasize in Section I(G) that "[w]here the context permits, any gender shall be deemed to refer to the other genders, the singular to refer to the plural and the plural to refer to the singular."

{23}    Following those commands, by properly reading "the plural to refer to the singular" in Section 9.1, makes it clear that after there are no longer two living grantors, the survivor is permitted to exercise what was previously a joint power of amendment or revocation: "Grantor[] reserve[s] the right at any time or times to amend or revoke this instrument and the trusts hereunder, in whole or in part, by an instrument or instruments in writing, signed by Grantor[] and delivered in Grantor['s] lifetime[] to Trustee."

{24}    The guidelines regarding gender and number interchangeability control a variety of the trust's provisions.  If we did not apply the section universally throughout the trust, absurdities would result. *See Roberts v. Sarros*, 920 So. 2d 193, 195-96 (Fla. Dist. Ct. App. 2006) (approving the use of singular and plural interchangeability when doing otherwise would make other portions of the document absurd).  For example, without substituting the singular for the plural, Section 5.1, giving the trustee the power to file tax returns "on behalf of Grantors during Grantors' lifetimes," would not allow the trustee to file tax returns on behalf of the surviving grantor.  Section 6.6.a, which requires the trustee "[d]uring Grantors' [l]ifetimes" to render accounts "to Grantors whenever requested to do so by Grantors," would leave the survivor powerless to demand an accounting or learn the status of the trust's income and principal.  Section 7.1 provides that the trustee may resign by giving "written notice to Grantors during Grantors' lifetimes, or after the death of both Grantors, to each of the adult beneficiaries."  Not reading the provision to refer to the single survivor after the

7

death of the first spouse would result in the absurdity that the trustee could resign only before the death of the first and after the death of the second, but not while only the second was still alive.

**{25}** In contrast, there are a few provisions of the trust agreement where the instrument contains express language clarifying that the context of those particular provisions would prohibit substitution of the singular for the plural. For example, Section 2.1, "Both Grantors Living and Competent," uses qualifying language to delineate which construction, singular or plural, is exclusively intended:

> While *both Grantors* are living, Trustee shall dispose of the net income and principal of the community property of this trust as *both Grantors* may direct Trustee from time to time by a written instrument signed by *both Grantors* and delivered to Trustee. If *one Grantor* becomes incapacitated, the competent Grantor shall have the right to dispose of the net income and principal of one-half of the community property as the competent Grantor may direct.

(Emphasis added.)

By the express addition of limiting adjectives before the nouns "Grantor" and "Grantors," Lowell and Martha clarified that any disposal of the trust property during their joint lifetimes could be done only by their joint instruction. There is no such limiting language in Section 9.1.

**{26}** The Court of Appeals was concerned that applying the trust's direction to interchange the plural and the singular where context would permit would have allowed either Lowell or Martha to alter the trust unilaterally during their joint lifetimes, to the detriment of the other's interests. This concern ignores the clear import of other provisions, including particularly Section 2.1's clear instruction that "[w]hile both Grantors are living, Trustee shall dispose of the net income and principal of the community property of this trust as both Grantors may direct Trustee from time to time by a written instrument signed by both Grantors . . . ." The trust's provisions, including the singular-for-plural directives and the provisions of both Section 2.1 and Section 9.1, can be, and therefore must be, read in harmony. Where "two portions, read in isolation, appear contradictory," we are to presume "the various portions complement or modify each other." Restatement (Third) of Prop. § 10.2 cmt. b.

**{27}** We recognize that courts should not "add words to those in the [instrument] to contradict its language," and we emphasize that we have no interest in adding words to contradict the language of the trust agreement before us. *Sanchez v. Quintana (In re Estate of Padilla)*, 97 N.M. 508, 513, 641 P.2d 539, 544 (Ct. App. 1982). Without adding or contradicting any terms, but simply by combining Sections 2.1 and 9.1 and substituting the singular for the plural as directed in Sections 4.2 and I(G), the trust provides clear and

8

consistent directives:

> Grantor[] reserve[s] the right at any time or times to amend or revoke this instrument and the trusts hereunder, in whole or in part, by an instrument or instruments in writing, signed by Grantor[] and delivered in Grantor['s] lifetime[, provided that w]hile both Grantors are living, Trustee shall dispose of the net income and principal of the community property of this trust [only] as both Grantors may direct . . . by a written instrument signed by both Grantors . . . .

**{28}** When its provisions are read in harmony, the trust agreement unambiguously provides that during the joint lifetimes of the grantors, amendments could be made only by direction of both; after the death of the first, amendments could be made by direction of the only one remaining to give directions.

*Testimony of Drafting Attorney*

**{29}** To the extent that it can be argued that there was any ambiguity in the proper interpretation of the documentation on its face, the extrinsic evidence provided by the attorney who was retained by Lowell and Martha to draft their trust agreement confirms our interpretation. All relevant evidence may be considered to determine a grantor's intent, including relevant extrinsic evidence, so long as it does not contradict the clear terms of an otherwise unambiguous donative document. *See* Restatement (Third) of Prop. § 10.2; *see also* § 46A-1-103(R) ("[I]ntent . . . may be established by other evidence that would be admissible in a judicial proceeding[.]"); *Garcia v. Taylor (In re Estate of Frietze)*, 1998-NMCA-145, ¶ 10, 126 N.M. 16, 966 P.2d 183 (noting that extrinsic evidence cannot contradict unambiguous terms). Here, attorney Marsh's affidavit was the only available extrinsic evidence of donative intent, and it demonstrated that Section 9.1 was drafted by the attorney with the intent of, and explained to Lowell and Martha as, conferring "upon the surviving spouse the power to amend the trust agreement after the death of the first spouse."

**{30}** Although our construction is consistent with that set forth in the drafting attorney's affidavit, the extent of the litigation in this case should serve as a caution to those drafting similar instruments to take special care when drafting in order to minimize the risks of confusion and unnecessary litigation, and, even worse, frustration of a grantor's intent by misinterpretation or invocation of default rules. *Cf.* Restatement (Third) of Trusts: Power of Settlor to Revoke or Modify § 63 cmts. b-d ("[N]o competent drafter ever leaves [the question of revocability] to default law.").

*Community Property Concerns*

**{31}** Finally, we address specifically the community property concerns addressed by Gary. While we respect the values inherent in our community property laws and of the community property principles expressed in the trust documents, they do not call for a different

interpretation of this trust instrument for several reasons. First, community property default rules do not override a grantor's intent as manifested in the trust. Second, Gary's citations to out-of-state cases are distinguishable from and inapplicable to this case. Finally, Lowell's amendments to the trust were within the spirit of our community property principles because his proposed distribution mathematically affected only his half of the community property.

**{32}** We start our community property analysis with a review of the relevant default rules set forth in the New Mexico statutes. The UTC provides the default rule for the amendability of a revocable community property trust:

> B.     If a revocable trust is created or funded by more than one settlor:
>
> (1) to the extent the trust consists of community property, the trust may be revoked by either spouse acting alone but may be amended only by joint action of both spouses[.]

Section 46A-6-602(B). The Restatement of the Law of Trusts bolsters the UTC's restriction on community property trust amendments. The general rule in the Restatement for multiple settlor trusts is that "unless the terms of the trust provide otherwise, each settlor ordinarily . . . may revoke or amend the trust with regard to that portion of the trust property attributable to the settlor's contribution." Restatement (Third) of Trusts § 63 cmt. k. However, the Restatement lists an exception for trusts "established by spouses and consisting of community property," which states:

> In the absence of a contrary provision in the terms of the trust, the trust may be *amended* only by the joint action of both spouses during their joint lifetime; but it may be *revoked* by either spouse acting alone, thereby terminating the trust and causing the property to be restored to the spouses, free of trust, as their community property.

*Id.*

**{33}** Both the UTC and the Restatement are careful to note that this default rule does not govern when the terms of the trust provide otherwise. Section 46A-1-105 (stating that "[e]xcept as otherwise provided in the terms of the trust, the [UTC] governs . . . [and] [t]he terms of a trust [generally] prevail over any provision of the Uniform Trust Code"); Restatement (Third) of Trusts § 63 cmt. k ("The trust terms, of course, may make contrary provision[.]"). As we have noted, Lowell and Martha did make contrary provisions in the trust they jointly created.

**{34}** In their trust agreement, Lowell and Martha manifested their desire to protect their respective community property interests while both were alive. Sections 2.1 ("Both Grantors Alive and Competent") and 2.2 ("Incapacity of Grantor") required written approval of both to dispose of community property and further provided that if one became incompetent or

10

incapacitated, the other could dispose of only his or her own half of any community property. Section 9.1 specifically provided that amendments or revocations would not affect the community or separate nature of the property they had placed in the trust. This is consistent with the default rules expressed in the New Mexico statutes, that with respect to community property "the trust may be revoked by either spouse acting alone but may be amended only by joint action of both spouses." Section 46A-6-602(B)(1).

**{35}**    After the death of the first spouse, however, Section 2.3 ("Death of First Grantor to Die") provided that Sections 2.1 and 2.2, dealing with revocations and amendments while both were alive, were no longer applicable. Lowell and Martha, through creation of their trust, chose to retain their community property interests while both were alive but also chose to leave their respective shares of their community property to the other after the death of the first. *See Bell v. Estate of Bell*, 2008-NMCA-045, ¶ 23, 143 N.M. 716, 181 P.3d 708 ("After funding the Trust, Decedent no longer owned those assets because they became the property of the Trust and because the title to the assets was thus in the Trustee."). They each chose upon death to leave all community property in the trust, rather than make a separate testamentary disposition, which either would have had the power to do in the absence of the trust. NMSA 1978, § 45-2-805(A) (1993) ("Upon the death of either spouse, one-half of the community property belongs to the surviving spouse, and the other half is subject to the testamentary disposition of the decedent . . . .").

**{36}**    In affirming the district court's grant of summary judgment in favor of trustee Wells Fargo, the Court of Appeals relied solely on the theory that Section 2.4's recognition of the survivor's power to withdraw all assets and do with them as he or she wished necessarily included the power to amend, because "it would serve no substantive purpose to permit revocation and creation of a new trust with the same corpus but not allow amendment of the original trust." *Cable*, 2008-NMCA-005, ¶ 16 (internal quotation marks and citation omitted). The opinion relied for that proposition on *Kimberlin v. Dell*, 218 S.W.3d 613, 617 (Mo. Ct. App. 2007) (holding that a power to revoke necessarily includes a power to amend), and *Suzan Tantleff Trusts v. FDIC*, 938 F. Supp. 14, 17-19 (D.D.C. 1996) (holding that a power to withdraw assets necessarily includes a power to revoke the trust entirely).

**{37}**    Gary challenges the Court of Appeals' reliance on precedents from non-community property jurisdictions and cites instead two cases from intermediate appellate courts in California, a community property jurisdiction. Those cases, however, construe different trust language reflecting different donative intent. *Parker v. Powell* (*In re Estate of Powell*), 100 Cal. Rptr. 2d 501, 505 (Cal. Ct. App. 2000), held that a surviving spouse's trust revocation was only effective as to half of the trust corpus because California's probate code transmuted the trust property "from community [property] to separate property upon [the wife's] death." *Powell* is distinguishable in several important respects: The *Powell* trust, unlike the Cable Family Trust, did not grant an unrestricted power to withdraw to the surviving spouse, it did not allow surviving spouse amendments through a will, it did not contain a provision that favored a construction in the surviving spouse's interests, and it did not contain other provisions expressing the grantors' intent to give the surviving spouse the power to amend.

11

The *Powell* court appropriately recognized that the controlling question was "one of interpretation of the trust instrument." *Id.* at 504 ("In interpreting the trust instrument, we seek the intent of the trustors as revealed in the document considered as a whole."). The simple difference between outcomes is that the Cable Family Trust contains many provisions clarifying that the surviving spouse has unrestricted amendment power, while the *Powell* trust was sufficiently ambiguous as to the scope of revocation to require that default rules be employed.

**{38}** *Crook v. Contreras (In re Estate of Kouba)*, 116 Cal. Rptr. 2d 319 (Cal. Ct. App. 2002), is also distinguishable. In *Crook*, a married couple executed a trust that by its express terms was expressly revocable and amendable only "during the *joint* lives of the Trustors," but became irrevocable upon the death of one. *Id.* at 321 (emphasis added) (internal quotation marks omitted). The trust also provided that upon the death of the first grantor, it would be divided into two separate trusts: "Trust A" would contain the surviving spouse's interest and "Trust B" would contain the remainder. The surviving spouse could not touch Trust B, but had substantial control over Trust A. The issue in the case only concerned the surviving spouse's control over Trust A. While Trust A gave the surviving spouse an unrestricted power to withdraw and allowed amendment through last will and testament, its express terms provided that "[e]xcept as otherwise expressly provided in this Declaration, *on the death of either Trustor the trusts created by this Declaration shall become irrevocable and not subject to amendment or modification*." *Id.* at 322 (emphasis added) (internal quotation marks omitted). While the disputed beneficiary argued that an unrestricted power to withdraw implied the power to amend, the *Crook* court decided that, "[s]ince the trust instrument **expressly** deprived [the surviving spouse] of the power to revoke, modify or amend the trusts, she also lacked any *implied* power to do so." *Id.* at 331. The Cable Family Trust, on the other hand, has no provision denying the survivor the power to amend, and in fact contains clear grants of control to the survivor.

**{39}** In addition to the fact that *Powell* and *Crook* are distinguishable, we note that both have been criticized for their reasoning and results in a judicial opinion and in the Estate Planning & California Probate Reporter. *See Papich v. Papich*, No. PR060208, 2007 WL 4181927, at *2 (Cal. Ct. App. Nov. 28, 2007) ("[T]he court's reasoning in *Powell* is faulty."); Continuing Educ. of the Bar, *Validity of Wills; Revocation of Trusts*, 23 Est. Plan. & Cal. Prob. Rep. 108 cmt. (Feb. 2002) ("[I]t is difficult not to be concerned about a conclusion [in *Crook*] that results in a triumph of form over substance.").

*Martha's Original Community Interest Unaffected by 1999 Amendment*

**{40}** Even if the law were different and a trust could not be created that would give a surviving spouse the right to make a trust amendment affecting what was once a deceased's half of their community property, the reality is that Lowell did not do so in this case. His 1999 amendments affected less than half of the assets remaining in the trust. By allowing what originally was Martha's half share to go equally to their three children, as they had contemplated in the first remainder distribution schedule, the totality of the 1999 distribution

12

amendments would be accomplished solely by dividing what originally was Lowell's half share in the following manner:

**Lowell's One-Half Interest (50% of the whole)**
| Gary | - | 1.63 % of the whole |
|---|---|---|
| Larrie | - | 1.63 % of the whole |
| Shirley | - | 7.73 % of the whole |
| Grandchildren | - | 27.50 % of the whole |
| Charity | - | 10.00 % of the whole |
| Friends | - | 1.50 % of the whole |

By adding these figures to Martha's original distribution schedule, a one-third share to each child from what had been her community interest, both Martha's and Lowell's desired distribution schemes could be achieved. The following table details the relevant calculations:

| Beneficiaries | Lowell's Share (% of whole trust) | Martha's Share (% of whole trust) | Total Received (% of whole trust) |
|---|---|---|---|
| Larrie Cable | 1.63% | 16.67% | 18.30% |
| Gary Cable | 1.63% | 16.67% | 18.30% |
| Shirley Trevino | 7.73% | 16.67% | 24.40% |
| Grandchildren | 27.50% | 0.00% | 27.50% |
| Charity | 10.00% | 0.00% | 10.00% |
| Friends | 1.50% | 0.00% | 1.50% |
| Approx. total | ˉ 50.00% | ˉ 50.00% | 100.0% |

**{41}** By contrast, Gary's position would deny not only Lowell's right to control the half of the community property that Martha intentionally had left in trust for his benefit, it would also deny Lowell's right to control the part that had been his own half of the community property before Martha's death. There is no principle of New Mexico law that would dictate such an extreme result. Indeed, even the California precedent relied on by Gary would not dictate that result. *See Powell*, 100 Cal. Rptr. 2d at 504 (recognizing effectiveness of surviving spouse's trust revocation as to his half of the trust corpus).

**{42}** Finally, we find it unnecessary to reach the propriety of the Court of Appeals' reliance solely on implying a right to amend from the surviving spouse's unrestricted power to withdraw all assets of the trust. Our holding is based on the broader basis of the donative intent reflected in the totality of the trust documentation and supporting extrinsic evidence in this case. While the provision granting an unrestricted right of the survivor to withdraw

all assets is certainly helpful in that analysis, it is only one of a number of manifestations of the intent expressed by Lowell and Martha in their trust. We do not need to, and by this Opinion explicitly do not, address hypothetical issues that might result from a trust in which there is an apparent conflict between a provision granting a survivor total power to withdraw and a provision denying the survivor the right to amend, as was presented in *Crook*.

## IV.    CONCLUSION

**{43}**    Lowell's 1999 amendments, including the revised distribution schedule and appointment of Wells Fargo as successor trustee, were authorized by both the letter and the intent of the Cable Family Trust. We therefore affirm the grant of summary judgment in favor of Wells Fargo and remand to the district court for further proceedings in accordance with this opinion.

**{44}    IT IS SO ORDERED.**

_____
**CHARLES W. DANIELS, Justice**

**WE CONCUR:**

_____
**EDWARD L. CHÁVEZ, Chief Justice**

_____
**PATRICIO M. SERNA, Justice**

_____
**PETRA JIMENEZ MAES, Justice**

_____
**RICHARD C. BOSSON, Justice**

**Topic Index for *Cable v. Wells Fargo*, No. 30,787**

| **MS** | **MISCELLANEOUS STATUTES** |
|---|---|
| MS-UT | Uniform Trust Code |
| **PR** | **PROPERTY** |
| PR-CP | Community Property |
| **WL** | **WILLS, TRUSTS, AND PROBATE** |
| WL-AM | Amendment |
| WL-DS | Distribution |

| | |
|---|---|
| WL-RV | Revocation |
| WL-TI | Testamentary Intent |
| WL-TG | Trusts, General |
| WL-TP | Construction of Trust Provisions |
| | |
| **ST** | **STATUTES** |
| ST-AP | Applicability |
| ST-IP | Interpretation |
| ST-SG | Statutes, General |