## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: 2019-NMCA-008

Filing Date: October 22, 2018

Docket No. A-1-CA-35621

NEW MEXICO MILITARY INSTITUTE,

      Plaintiff-Appellee,

v.

NMMI ALUMNI ASSOCIATION, INC.,
a New Mexico non-profit corporation,

      Defendant-Appellant.

APPEAL FROM THE DISTRICT COURT OF CHAVES COUNTY
Jane Shuler Gray, District Judge

Hinkle Shanor, LLP
Richard E. Olson
Parker B. Folse
Roswell, NM

for Appellee

Keleher & McLeod, P.A.
Jeffrey A. Dahl
Michael G. Smith
Albuquerque, NM

for Appellant

OPINION

**KIEHNE, Judge.**

**{1}** The New Mexico Military Institute (NMMI) sued the New Mexico Military Institute Alumni Association, Inc. (the Association), claiming that the Association breached its contractual obligation to maintain a proper financial accounting system and also alleging that the Association was NMMI's agent. NMMI asked that the Association be made to turn over donations it received while acting as NMMI's agent. After a bench trial, the district court found that the Association had not breached its contractual obligations to NMMI, but it also found that the contract between the Association and

1

NMMI was terminable at will, that the Association was NMMI's agent, and that NMMI had legally terminated the contract and revoked the Association's authority to act as its agent. Based upon its latter findings, the district court imposed a constructive trust over donations that the Association received while acting as NMMI's agent.

**{2}** The Association appeals, claiming that: (1) NMMI lacked standing to bring its claims against the Association; (2) the district court's ruling that the contract was terminable at will should be reversed because NMMI did not raise that theory until after trial; (3) the district court's agency determination was not supported by substantial evidence; (4) imposition of a constructive trust was improper; and (5) requiring the Association to turn over donations that it received to NMMI violated the donors' intent. We hold that NMMI had standing, we affirm the district court's agency finding and the imposition of the constructive trust, and we reject the Association's claim that the constructive trust violates the donors' intent. Because we conclude that NMMI had a right to terminate its agency relationship with the Association regardless of the existence of the contract between them, we do not reach the questions of whether the contract was terminable at will or whether NMMI appropriately terminated the contract.

**BACKGROUND**

**{3}** NMMI is a state-funded school that provides students with up to four years of high school and two years of junior college instruction. The Association is a non-profit corporation whose purpose, as stated in its articles of incorporation, is "to promote the interest and welfare of [NMMI]. . .; to afford a permanent means of contact between [NMMI] and its alumni; to create, establish and maintain scholarships and student loan funds; and to collect and administer trust funds and endowments for the use and benefit of [NMMI]; and to do generally any and all things which may be deemed advisable, necessary or desirable in the interest of the [NMMI], its students and faculty." The Association's bylaws also describe its purposes as being, among other things, "[t]o promote the interest and welfare of the [NMMI,]" to "foster[] lifelong connections between its Alumni and [NMMI,]" and to "help establish and maintain scholarships, in conjunction with the New Mexico Military Institute Foundation (the NMMI Foundation), for deserving cadets to attend [NMMI.]"

**{4}** The Association was incorporated in 1964 and was originally staffed by NMMI employees. In 1993 the Association and NMMI entered into a Memorandum of Agreement (MOA), and the staffers handling alumni communication and coordination left the employment of NMMI and became employees of the Association. The employees' duties did not change. NMMI continued to provide office space and utilities to the Association free of charge. The Association staff also used NMMI phone lines and email servers, and used "@nmmi.edu" email addresses.

**{5}** The Association and NMMI entered into a series of agreements between 1993 and 2013. The first was the 1993 MOA referenced above. In 2001 the Association and NMMI entered into a new MOA (the 2001 MOA). They entered into a third MOA in 2012 (the 2012 MOA). The 2001 MOA contained a number of affirmative covenants requiring the

2

Association to do a number of things unless excused in writing by NMMI. These included maintaining the Association's status as a 501(c)(3) corporation; maintaining the composition of the membership of its board of directors in accordance with its bylaws; employing an executive secretary selected by its board of directors; and retaining advisory and other professional services as deemed necessary to perform its primary function of supporting NMMI; serving as the primary repository of records relating to NMMI alumni; providing NMMI publications to alumni, cadets, and patrons; maintaining a database with continued updates of all alumni to be used by NMMI for fundraising programs; and receiving donations and disbursing those funds in conformity with any conditions imposed by the donors and in accordance with NMMI rules and regulations governing financial aid to cadets.

{6}     The 2012 MOA contained the same affirmative covenants. The 2012 MOA also contained language stating that NMMI had reviewed the Association's articles and bylaws and "found them acceptable" and that any proposed amendments would be provided to NMMI for consideration and comment. All three MOAs contained provisions obligating the Association to manage, document and track its financial activity and provide financial information to NMMI. The 1993 and 2001 MOAs contained language stating that the Association was not NMMI's agent. The 2012 MOA, however, did not contain this language and did not say anything about whether an agency relationship existed between the parties.

{7}     NMMI, the Association, and the NMMI Foundation, a non-profit foundation that provides primarily financial support to NMMI, provided financial support to the Association, and holds scholarship funds for students of NMMI, also entered into an "Alliance Agreement" to coordinate fundraising efforts. The Alliance Agreement outlined the duties of each party relating to fundraising. This agreement required that the Association supply an annual budget to the Alliance Committee, a group made up of representatives from the NMMI Foundation, NMMI, and the Association for approval.

{8}     The Association held funds given to it by donors for the purpose of providing scholarships to NMMI students. Some of these funds had donor-imposed restrictions. The scholarship committee, which consisted of representatives from NMMI, the Association, and the NMMI Foundation, met each February to award scholarships from those funds. Students seeking scholarships would contact NMMI's financial aid office, and if a scholarship was awarded to a student using the Association's funds, NMMI would bill the Association at the end of the academic year.

{9}     In July 2009, NMMI hired a new president and superintendent, Major General Jerry Grizzle. General Grizzle reviewed the agreements between NMMI and the Association that were then in force, including the 2001 MOA and the Third Amended Alliance Agreement. General Grizzle believed that the 2001 MOA was outdated and wanted to update it to reflect "current processes, procedures, titles." General Grizzle also became concerned about the Association's operations and believed it was "in violation of every condition" in the 2001 MOA. Beginning in 2010, General Grizzle had discussions with successive board presidents of the Association about his concerns. General Grizzle's

primary concern was his belief that the Association was not complying with the MOA's provisions governing financial accounting and management of its finances. These efforts resulted in the parties signing the 2012 MOA.

{10}    The Association, however, still did not provide any audited financial statements to NMMI, and it appeared to General Grizzle that the Association was not likely to file a timely, audited tax return. Thus, on February 21, 2013, NMMI's Board of Regents sent a letter to the Association stating that it intended to terminate the 2012 MOA because the Association had not maintained an adequate financial accounting system and had not provided NMMI with a copy of its annual audit, and asking it to cure these problems within thirty days. The Association did not respond to this letter. In April 2013, NMMI sent a final notice to the Association that it was terminating the relationship between NMMI and the Association. On this same date, NMMI removed the Association from its offices on NMMI property.

{11}    NMMI brought suit against the Association in June 2013 claiming that the Association breached its contractual obligation to maintain an adequate financial accounting system, and that the Association was in possession of funds that it received on behalf of NMMI while acting as NMMI's agent. It asked the district court to: freeze the Association's accounts; prohibit the Association from using NMMI's name, logos, and trademarks; impose a constructive trust on funds in the Association's custody; appoint a receiver; order the Association to account for funds it received while an agent of NMMI; and order the Association to transfer all funds received for the benefit of NMMI or its cadets to an appropriate custodian.

{12}    The district court held a one-week bench trial. Most of the evidence and argument focused on the Association's allegedly inadequate accounting system, but the parties also tried the issue of whether the Association was NMMI's agent. After the trial, the district court issued an initial set of findings of fact and conclusions of law, finding that the Association acted as NMMI's agent, that the Association did not breach the 2012 MOA, and that NMMI had improperly terminated the 2012 MOA. The district court then issued a judgment and order, imposing a constructive trust over funds in the Association's custody, and stating that because the Association was NMMI's agent, it had a duty to convey these funds to NMMI or the NMMI Foundation if NMMI so directed. After post-trial motions filed by both parties, the district court issued supplemental findings of fact and conclusions of law, reiterating that the Association had acted as NMMI's agent, and stating that "NMMI, as the principal, [could] terminate the Association's authority to act as its agent for any reason." The district court also found that the 2012 MOA was terminable at will. The court issued an amended judgment reiterating its agency finding and the creation of a constructive trust over funds in NMMI's custody. The Association appeals from the district court's ruling and its imposition of a constructive trust.

**DISCUSSION**

**A.    NMMI had standing to sue the Association**

4

**{13}** New Mexico's standing doctrine requires litigants to allege that "(1) they are directly injured as a result of the action they seek to challenge[,] (2) there is a causal relationship between the injury and the challenged conduct[,] and (3) the injury is likely to be redressed by a favorable decision." *ACLU of N.M. v. City of Albuquerque*, 2008-NMSC-045, ¶ 1, 144 N.M. 471, 188 P.3d 1222. Whether a party has standing presents a question of law that we review de novo. *Id. ¶ 6.*

**{14}** Here NMMI alleged in its complaint that the Association acted as its agent, that "[a]lumni and others have made numerous and substantial monetary contributions to the Association on the condition, both express and implied, that those funds directly benefit NMMI," and that because the relationship between NMMI and the Association had been terminated, the Association should not be allowed to retain control over funds that were intended to benefit NMMI. These claims allege an injury to NMMI in the form of loss of access to and control over funds intended to support its students and programs.

**{15}** NMMI further alleged that it had demanded the return of the funds, but that the Association had not responded to the demand, and apparently could not or would not act on the demand because its board had split into two factions with contrary aims. These allegations were sufficient to allege a causal connection between NMMI's loss of access to and control over the funds and the Association's unwillingness or inability to return the funds to NMMI, despite its obligation to do so as NMMI's agent. *See, e.g.*, *Moser v. Bertram*, 1993-NMSC-040, ¶ 6, 115 N.M. 766, 858 P.2d 854 (stating that an "agent stands in a fiduciary relationship with his or her principal, a position of great trust and confidence commanding the utmost good faith"); Restatement (Third) of Agency § 8.01 (Am. Law Inst. 2006) ("An agent has a fiduciary duty to act loyally for the principal's benefit in all matters connected with the agency relationship."). Finally, a favorable decision would redress NMMI's alleged injury by giving it control over funds that the Association had raised on NMMI's behalf.

**{16}** The Association claims, however, that NMMI failed to prove that it suffered any injury because the district court rejected NMMI's claim that it violated the 2012 MOA. The Association acknowledges NMMI's argument that as its agent, "the Association must return property that it can no longer rightfully possess after the termination of the agency relationship[,]" but asserts that NMMI lacks standing because: (1) NMMI failed to prove that it suffered any injury; (2) NMMI failed to offer evidence "that would suggest that the Association was not the proper party to hold and administer the funds under its control"; (3) "no language in the MOA . . . suggest[s] that [NMMI] is the proper owner or trustee of the Association's funds"; and (4) "[t]here is also no law on point that holds that an agent must disgorge its own property to a principal absent any breach of fiduciary duty."

**{17}** These arguments lack merit. The premise of the Association's arguments is that NMMI needed to demonstrate that the Association committed some breach of duty, or caused some harm, to justify NMMI's decision to terminate the agency relationship. But as we will explain at further length in response to the Association's substantial evidence claim, NMMI was entitled to terminate the Association's status as its agent for any

5

reason or no reason. The Association was therefore obligated to turn over to NMMI all donations that it had collected on NMMI's behalf, even if its conduct was faultless. Here, NMMI sufficiently demonstrated that it had standing by alleging and proving that the Association was its agent, that the agency relationship had been terminated, and that nevertheless the Association would not or could not turn over to NMMI the donations that it had collected on NMMI's behalf. We therefore conclude that NMMI had standing to pursue its claims against the Association. *See Am. Fed'n of State, Cty. & Mun. Employees, Council 18 v. Bd. of Cty. Comm'rs*, 2016-NMSC-017, ¶ 32, 373 P.3d 989 (holding that injury-in-fact requirement to obtain standing is satisfied where the plaintiff "show[s] that [it] is imminently threatened with injury, or, put another way, that [it] is faced with a real risk of future injury, as a result of the challenged action or statute" (internal quotation marks and citation omitted)).

**B.      The district court's determination that the Association was acting as NMMI's agent is supported by substantial evidence**

**{18}**     The Association next claims that substantial evidence does not exist to support the district court's finding that the Association acted as NMMI's agent, because there was no evidence that NMMI exercised the degree of control over the Association required to support the existence of an agency relationship. We disagree.

**{19}**     "On appeal, we will not disturb a finding of agency if [it is] supported by substantial evidence." *Gallegos v. Citizens Ins. Agency*, 1989-NMSC-055, ¶ 17, 108 N.M. 722, 779 P.2d 99. "Substantial evidence is such relevant evidence that a reasonable mind would find adequate to support a conclusion." *State ex rel. King v. B & B Inv. Grp., Inc.*, 2014-NMSC-024, ¶ 12, 329 P.3d 658 (internal quotation marks and citation omitted). "[W]hen considering a claim of insufficiency of the evidence, the appellate court resolves all disputes of facts in favor of the successful party and indulges all reasonable inferences in support of the prevailing party." *Las Cruces Prof'l Fire Fighters v. City of Las Cruces*, 1997-NMCA-044, ¶ 12, 123 N.M. 329, 940 P.2d 177.

**{20}**     "An agent is one authorized by another to act on his behalf and under his control." *Hansler v. Bass*, 1987-NMCA-106, ¶ 28, 106 N.M. 382, 743 P.2d 1031. Whether an agency relationship exists is a question of fact to be determined "from all of the facts and circumstances of the case, together with the conduct and communications between the parties." *Brown v. Cooley*, 1952-NMSC-083, ¶ 8, 56 N.M. 630, 247 P.2d 868. The existence of an agency relationship does not depend on the name that the parties use to describe their relationship. *See Chevron Oil Co. v. Sutton*, 1973-NMSC-111, ¶ 4, 85 N.M. 679, 515 P.2d 1283 (stating that "the majority rule is that the manner in which the parties designate a relationship is not controlling, and if an act done by one person on behalf of another is in its essential nature one of agency, the one is the agent of the other, notwithstanding he is not so called").

**{21}**     Here, the Association does not dispute that it acted on NMMI's behalf, but claims that NMMI did not exercise sufficient control over the Association to render the Association its agent. In determining whether an agency relationship exists, the "principal

6

consideration" is "the control, or right to control" the agent's conduct. *Shaver v. Bell*, 1964-NMSC-255, ¶ 16, 74 N.M. 700, 397 P.2d 723. The principal, however, need not control, or have a right to control, all aspects of the agent's activities. "Thus, a person may be an agent although the principal lacks the right to control the full range of the agent's activities, how the agent uses time, or the agent's exercise of professional judgement." Restatement (Third) of Agency § 1.01 cmt. c (Am. Law Inst. 2006).

{22}    In New Mexico, our case law has not required a particularly invasive level of control to support a finding that a principal-agent relationship exists. For example, in *Shaver*, a plaintiff who was injured after slipping in a puddle of gasoline at a service station sued both the actual operators of the station (Bass and Hendrix) and the man who had leased the station and sold gasoline to them (Bell) for negligence. Bell argued that Bass and Hendrix were not his agents because he could not control their operation of the gas station, and he obtained summary judgment on that basis. *Shaver*, 1964-NMSC-255, ¶ 1. Our Supreme Court reversed, holding that a dispute of fact existed about whether Bass and Hendrix were Bell's agents, although Bell did not control their day-to-day activities, where: (1) Bell provided "certain specified equipment" to the station; (2) Bell provided advertising for the station and paid its utilities; (3) Hendrix and Bass agreed to purchase gasoline sold by Bell; (4) Bell employed a "[s]tation [s]upervisor" to check on the station every week or two; and (5) Bell "sometimes suggested the price at which the gasoline should be sold, as well as ways to increase the business of the station, [although] these were suggestions only." *Id.* ¶¶ 3, 25-26. Similarly, in *Chevron Oil*, our Supreme Court held that an issue of fact existed about whether Chevron, who had leased a gas station to a man named Sharp, but did not control his day-to-day operations, was in a principal-agent relationship where Chevron required Sharp to promote Chevron's products, to remain open for certain hours, and to meet minimum standards of cleanliness and order, and where Chevron provided Sharp with gasoline, advertising, and uniforms, and allowed his customers to pay with Chevron credit cards. 1973-NMSC-111, ¶ 7. And in *Gallegos*, our Supreme Court held that an insurance agency was in a principal-agent relationship with an insurance salesman where the salesman had access to the insurance agency's office building and rate books, solicited business for the insurance agency, and received price information from the insurance agency to relay to his customers. 1989-NMSC-055, ¶ 18.

{23}    We conclude that substantial evidence supported the district court's finding that NMMI exercised sufficient control over the Association to place them in a principal-agent relationship. First, there was abundant evidence to support the existence of a close relationship between NMMI and the Association, and that the donations it solicited were for the benefit of NMMI and its students. The district court found that "[t]he Association, as an affiliated entity, has provided support to NMMI by raising funds on behalf of NMMI that were intended to benefit NMMI and its cadets[,]"; that "[t]he Association solicited donations on behalf of NMMI,"; that "[o]n behalf of NMMI, the Association created and established endowments, including those for scholarships, intended to benefit [the Association],"; and that the Association "solicited and raised funds to promote and help fund NMMI's] annual homecoming festivities," to "offset and support the costs of various NMMI programs and cadet activities[,]" and to "create and establish professorial

endowments at NMMI." All three MOAs, the Association's by-laws, and the Association's articles of incorporation described the Association's purposes as promoting the interest and welfare of NMMI and collecting and administering trust funds and endowments for the use and benefit of NMMI. The 2001 and 2012 MOAs specified that the Association would serve as the primary repository of records relating to alumni for NMMI. The Association's scholarship funds were solicited on behalf of NMMI's students.

{24} There was also substantial evidence of NMMI's power to control the Association's fundraising activities. The district court found that as an "affiliated entity with NMMI, the Association has been permitted to use the name 'NMMI' in its corporate title and allowed the use of NMMI's name and marks in its letterhead"; that "[u]ntil NMMI declared the [2012 MOA] to be terminated, the Association's office was located on the campus of NMMI"; up until the 2012 MOA, all previous MOAs stated that the Association was not an agent of NMMI; and that "[a]ll three MOAs required the Association to undertake several commitments[,]" including the maintenance of an adequate financial accounting system and submission to annual audits. Any changes to the Association's bylaws and its articles of incorporation required NMMI approval. The 2001 and 2012 MOAs also required the Association to do a number of things, "unless excused by [NMMI] in writing," including maintaining its existence as a tax-exempt organization, employing an executive secretary, organizing its staff and retaining advisory and other professionals services as it deemed necessary." These provisions indicate a level of control on the part of NMMI, as they outline the basic structure and organization that the Association was to have and make clear where the Association had authority to exercise its own professional discretion.

{25} The 2012 MOA also required the Association to provide NMMI publications to alumni, provide and maintain a database with continued updates of all alumni, and to receive and disburse scholarship funds in conformity with all conditions imposed by the donors and in accordance with NMMI rules governing financial aid to cadets. Students at NMMI had to apply for Association-administered scholarships through NMMI's financial aid office, and the Association provided the scholarship funds for students to NMMI.

{26} This evidence established that NMMI exercised at least as much, if not more, control over the Association as did the principals in *Shaver*, *Chevron Oil*, and *Gallegos*. To be sure, the Association pointed to contrary evidence, such as the testimony of its past president, John Phinizy, and its former executive secretary, David Romero, that NMMI did not control the Association's actions; NMMI's audited financial statements, which appeared to disclaim any ability to control the Association's daily operations; and statements in the 1993 and 2001 MOAs that explicitly disclaimed a principal-agent relationship between NMMI and the Association. But on substantial evidence review, "[t]he question is not whether substantial evidence exists to support the opposite result, but rather whether such evidence supports the result reached." *Sandoval v. Baker Hughes Oilfield Operations, Inc.*, 2009-NMCA-095, ¶ 41, 146 N.M. 853, 215 P.3d 791 (internal quotation marks and citation omitted). Having concluded that the evidence was sufficient

8

to support the district court's finding that the Association acted as NMMI's agent, we affirm that finding.

**C.    NMMI had the power to terminate its agency relationship with the Association, regardless of whether the 2012 MOA was terminable only for cause, and the district court's imposition of the constructive trust was proper**

**{27}**    The Association vigorously argues that NMMI could only terminate the 2012 MOA for cause, and given that the district court found that the Association did not violate the 2012 MOA, NMMI suffered no injury that would entitle it to end the parties' relationship or justify the imposition of a constructive trust requiring that it transfer the scholarship funds in its possession to NMMI. The Association also argues that the district court's post-trial finding that the 2012 MOA was terminable at will cannot justify the order requiring it to turn over its scholarship funds to NMMI, and should be reversed, because NMMI did not raise the terminable-at-will theory until after trial concluded. Moreover, the Association argues that even if the district court's agency finding was supported by the evidence, that "would not justify the transfer of funds to [NMMI]." The Association therefore asks this Court to reverse the district court's judgment and "order the immediate return of the funds" to the Association. In response, NMMI argues that because the Association was its agent, it therefore could end its agency relationship regardless of whether the 2012 MOA was terminable only for cause, and even if the Association complied with all of its obligations to NMMI. Whether NMMI as principal could terminate its agency relationship with the Association without cause presents a question of law that we review de novo. *See Bank of N.Y. Mellon v. Lopes*, 2014-NMCA-097, ¶ 6, 336 P.3d 443 ("We review issues of law de novo.").

**{28}**    Although the parties have not cited any New Mexico cases that have directly addressed the issue, the overwhelming, if not unanimous, weight of authority is that a principal has the power to terminate an agency relationship at any time and for any reason, even if the principal and agent have signed a contract providing that their relationship is irrevocable or may be terminated only for cause. The Restatement (Second) of Agency § 118 (Am. Law Inst. 1958) states that "[a]uthority terminates if the principal or the agent manifests to the other dissent to its continuance[,]" and Comment b to this section explains that "[t]he principal has power to revoke and the agent has power to renounce, although doing so is in violation of a contract between the parties." A principal or agent who terminates the relationship in violation of such a contract may still be subject to liability to the other party for breach of contract. Restatement (Second) of Agency § 118 cmts. b, c. There is an exception to this rule where the agent's authority is a "power given as security[,]" Restatement (Second) of Agency § 138 (Am. Law. Inst. 1958), but that does not apply here.

**{29}**    The Restatement (Third) of Agency § 3.10 (Am. Law Inst. 2006) similarly states that "[n]otwithstanding any agreement between the principal and agent, an agent's actual authority terminates . . . if the principal revokes the agent's actual authority." Comment b to this section also states that the principal's power to revoke an agent's authority "is not extinguished because an agreement between principal and agent states that the agent's

9

actual authority shall be irrevocable or shall not be revoked except under specified circumstances[,]" although exercising that power "may constitute a breach of contract." Comment b further explains that "[t]he rationale for the power to revoke . . . is that agency is a consensual relationship." The power to revoke is justified because an agent with authority "holds ongoing power to act with adverse consequences for the principal[,]" and thus a principal should not be compelled to accept the services of an agent that has lost the principal's confidence. Restatement (Third) of Agency § 3.10 cmt. b. The principal may, however, still be liable for breach of contract if it has wrongfully terminated an agent's authority (except that specific performance is not a remedy available to the agent). *Id.*

**{30}** Case law from other jurisdictions confirms application of these general principles, and the Association has not cited any authority to the contrary. *See, e.g.*, *Gov't Guarantee Fund of Republic of Finland v. Hyatt Corp.*, 95 F.3d 291, 300 (3d Cir. 1996) (stating that agency relationship is ordinarily terminable even if the parties agreed the relationship could not be terminated); *Woolley v. Embassy Suites, Inc.*, 278 Cal. Rptr. 719, 724 (Ct. App. 1991) (stating that "[i]t is a cardinal principle of agency law that a principal who employs an agent always retains the power to revoke the agency"); *Ireland v. Wynkoop*, 539 P.2d 1349, 1362 (Colo. App. Ct. 1975) (reversing portion of injunction that purported to prevent principal from terminating agent's authority, noting that principal has the power to terminate an agency relationship at any time, even in breach of a contract).

**{31}** Because the district court found that the Association was NMMI's agent (a finding that we have already held was supported by substantial evidence), it follows that NMMI could terminate the Association's authority to act as its agent without cause, even if the 2012 MOA could only be terminated for cause, and despite the district court's finding that the Association did not breach the 2012 MOA. While we are sympathetic with the Association's protests that it did not breach any duty to NMMI, mismanage any of its funds, or give NMMI any cause to terminate their relationship, the law is clear that NMMI needed no cause to terminate the Association's status as an agent. The Association further argues that allowing NMMI to terminate their relationship without cause violates New Mexico law requiring the enforcement of contracts, because the 2012 MOA only allows termination for cause. But as we have stated, the law allows a principal to terminate an agent's authority to act regardless of any agreement to the contrary. If the Association believed that NMMI breached the 2012 MOA by terminating the relationship, the Association could have asserted a breach of contract counterclaim in the district court, but it did not do so.

**{32}** Because NMMI had the power to terminate its agency relationship with the Association, it follows that the district court properly imposed a constructive trust requiring the Association to turn over funds it solicited on NMMI's behalf while acting as NMMI's agent. "The imposition of a constructive trust is an equitable remedy . . . within the broad discretion of the district court." *In re Estate of Duran,* 2003-NMSC-008, ¶ 35, 133 N.M. 553, 66 P.3d 326. "A constructive trust will be imposed to prevent unjust

10

enrichment that would result if the person having the property were permitted to retain it." *Id.* ¶ 34 (internal quotation marks and citation omitted).

**{33}**     As an agent, the Association owed fiduciary duties to its principal, NMMI. *Hydro Res. Corp. v. Gray*, 2007-NMSC-061, ¶ 40, 143 N.M. 142, 173 P.3d 749 (stating that "agency is a *fiduciary* relationship, whereby the agent is required to act only in the interest of the principal"). As part of its fiduciary duty, the Association was required to respect NMMI's interest in the donations that it solicited on NMMI's behalf. *See* Restatement (Third) of Agency § 8.12 (Am. Law Inst. 2006) (stating that an agent has a duty "not to deal with the principal's property so that it appears to be the agent's property" and "to keep and render accounts to the principal of money or other property received or paid out on the principal's account"). Once NMMI terminated the Association's status as an agent, it was required to turn over those funds to NMMI. *See* Restatement (Third) of Agency § 8.05 cmt. b (Am. Law Inst. 2006) ("A former agent who continues to possess property of a principal has a duty to return it and to comply with . . . management and record-keeping rules[.]"). It would therefore have been unjust for the district court to allow the Association to retain those funds in the face of NMMI's demand for their return. The district court therefore acted within its discretion by imposing the constructive trust.

**D.     The Association's claim that the district court's imposition of a constructive trust violated the donors' intent and New Mexico testamentary law lacks merit**

**{34}**     The Association's final claim is that the district court's constructive trust violated the intent of donors who made testamentary gifts to the Association to be administered by the Association. We hold that this claim is meritless.

**{35}**     As discussed above, the district court's imposition of the constructive trust was based on its finding that the Association was NMMI's agent, and on its conclusion that NMMI, as principal, was entitled to terminate the agency relationship and require the Association, as its agent, to turn over all funds that it received while acting as NMMI's agent. The Association claims that it is nevertheless entitled to keep the funds that it received and solicited on NMMI's behalf because the donors intended that the Association should be in charge of administering and distributing those funds. In support of this claim, the Association cites *In re Cable Family Trust*, 2010-NMSC-017, 148 N.M. 127, 231 P.3d 108 and *In re Estate of Seymour*, 1979-NMSC-069, 93 N.M. 328, 600 P.2d 274 for the legal principle that a donor "may do as he or she wishes with his or her money" and that courts should therefore strive to give effect to a donor's intent. The Association, relying on *Schwarzkopf v. American Heart Association*, 541 So. 2d 1348 (Fla. Dist. Ct. App. 1989) and *National City Bank of Michigan/Illinois v. Northern Illinois University*, 818 N.E.2d 453 (Ill. App. Ct. 2004), also argues that a court "has no authority to alter the terms of a decedent's will, even if there is evidence that there is a more cost effective and efficient means of operation."

11

**{36}** The Association's arguments, however, do not grapple with the district court's actual ruling or demonstrate that it was wrong. We have no quarrel with the principle that courts should attempt to give effect to the intent of donors or testators with respect to the disposition of their assets, or with the Association's reliance on *Cable* and *Seymour* for that general proposition. But the district court found that the funds at issue here were donated to the Association in its capacity as an agent for NMMI, and that NMMI was therefore entitled to demand that they be turned over to it. The Association has cited no authority for the proposition that where an agent receives or solicits funds on behalf of its principal, it is entitled to keep those funds, even in the face of a demand from its principal for their return, merely because the donor intended that the agent be the one to administer the funds. Accordingly, the Association has failed to demonstrate that the district court erred. *See In re Adoption of Doe*, 1984-NMSC-024, ¶ 2, 100 N.M. 764, 676 P.2d 1329 ("We assume where arguments in briefs are unsupported by cited authority, counsel after diligent search, was unable to find any supporting authority.").

**{37}** Similarly, we also have no reason to dispute the principle that a court may not modify a will or gift merely because there's a more efficient way of distributing the funds. But the district court's decision was not based on efficiency concerns, and the Association's argument and authority on this point are therefore irrelevant. Accordingly, we reject the Association's challenge to the district court's order directing it to turn over funds that it received while acting as NMMI's agent.

**CONCLUSION**

**{38}** We affirm the district court's judgment.

**{39}** **IT IS SO ORDERED.**

_____
**EMIL J. KIEHNE, Judge**

**WE CONCUR:**

_____
**J. MILES HANISEE, Judge**

_____
**JULIE J. VARGAS, Judge**